Filed 4/13/26  P. v. Smith CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B339651 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA022581) |
| v. | |
| RICKEY SMITH, JR., | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Affirmed and remanded with directions.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Scott A. Taryle, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1996, then-19-year-old Rickey Smith exploited his friendship with Jonathan Landau, then 15 years old, to gain entry to the Landau family home for the purpose of committing a home invasion robbery. Once inside the Landaus' residence, Smith opened the front door to allow his younger cousin, Antwan Allison, to enter. Allison—wearing a black ski mask, carrying duct tape, and wielding a loaded gun—ordered Jonathan[1] and his parents, Richard and Donna Landau, to turn over their jewelry. Smith then applied duct tape to the Landaus' hands and eyes. And either Smith or Allison affixed a plastic bag around Donna's head with duct tape. When Donna said she was having difficulty breathing, someone popped a hole in the bag. Moments later, however, one of the perpetrators shot Richard, Donna, and Jonathan. Richard died of a gunshot wound to the neck and chest. Donna likewise died of a gunshot wound to the chest. Jonathan, who suffered a gunshot wound to his leg, survived the incident.

A jury convicted Smith of the murders of Richard and Donna, among other offenses, and the trial court sentenced Smith to life in prison without the possibility of parole.

In 2021, Smith filed a petition pursuant to Penal Code[2] section 1172.6 challenging his murder convictions. That section permits defendants convicted under certain theories of homicide invalidated by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015)—including certain felony murder theories—to file a petition seeking resentencing. (§ 1172.6, subd. (a).) If the petition sets forth a prima facie case for relief, the court must hold an

---

[1] We refer to the victims by their first names because they share a last name. We likewise refer to Smith's wife by her first name.

[2] Subsequent statutory references are to the Penal Code.

evidentiary hearing at which the prosecution bears the burden of "prov[ing], beyond a reasonable doubt, that the petitioner is guilty" under a still-valid theory of murder. (§ 1172.6, subd. (d)(3).)

The trial court here conducted an evidentiary hearing on Smith's petition. At the hearing, the prosecution relied exclusively on the existing record of Smith's jury trial. The defense introduced new evidence in the form of testimony from a clinical psychologist who opined that Smith's age at the time of the offense, coupled with his childhood trauma, might have impaired his ability to appreciate the consequences of his actions. At the conclusion of the hearing, the court found Smith guilty beyond a reasonable doubt as a major participant in the robbery who acted with reckless indifference to human life—a theory of homicide that remains valid post-Senate Bill No. 1437. (See *People v. Emanuel* (2025) 17 Cal.5th 867, 879-881 (*Emanuel*).) The court therefore denied Smith's petition.

Smith now asks us to reverse, arguing the evidence is insufficient to support the court's finding. We disagree. Substantial evidence—including fingerprint analysis and testimony from Jonathan and from Smith's wife, Thricia— supports that Smith orchestrated the incident and consciously disregarded " ' "the significant risk of death his . . . actions create[d]." ' [Citation.]" (*Emanuel, supra,* 17 Cal.5th at p. 884.)

Accordingly, we reject Smith's challenge to the court's finding and affirm. We, however, grant Smith's unopposed request that we direct the trial court to correct certain clerical errors in the amended abstract of judgment.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

We summarize only the facts and procedural history relevant to our resolution of this appeal.

3

## A.    Overview of Smith's Convictions and Sentence

In 1996, the district attorney charged Smith and Allison with the murders of Richard and Donna (§ 187, subd. (a)) (counts 1 and 2).  The charging document further alleged the special circumstance that Smith and Allison committed the murders while "engaged in . . . the commission of the crime[s] of burglary . . . [¶] . . . [and] robbery" (capitalization omitted; see § 190.2, subd. (a)(17)).  In addition, the district attorney charged both defendants with the attempted murder of Jonathan (§§ 187, subd. (a), 664) (count 3), first degree residential burglary (§ 459) (count 4), home invasion robbery (§ 211) (counts 5 through 7), and conspiracy to commit home invasion robbery (§ 182, subd. (a)(1)) (count 8).

The case proceeded to trial in April 1997.  The prosecution tried Smith and Allison jointly, but before separate juries.  Smith's jury convicted him on all counts and found true that he committed the murders while engaged in the crimes of burglary and robbery.  Allison's jury hung, and the prosecution retried him in September 1997.  The jury in that second trial convicted Allison of two counts of first degree murder, but hung on the robbery and burglary special circumstance allegations.  Allison later admitted those allegations as part of a plea deal.

The trial court sentenced Smith to two terms of life in prison without the possibility of parole on the murder counts, plus a consecutive 25-years-to-life sentence on the attempted murder count.  On direct appeal, we affirmed the judgment with modifications to the sentence that did not affect the aggregate term. (*People v. Smith* (Nov. 24, 1998, B120300) [nonpub. opn.] (*Smith I*).)

4

## B.    Section 1172.6 Proceedings

More than 20 years later, effective January 2019, the Legislature enacted Senate Bill No. 1437.  *(People v Lewis* (2021) 11 Cal.5th 952, 959 *(Lewis)*.)  As relevant here, the bill "significantly narrowed the scope of the felony-murder rule" such that "[a] person who did not kill or act with the intent to kill can be liable for murder under the felony-murder doctrine only if he or she 'was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2.' [Citations.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 880.)

Senate Bill No. 1437 also added section 1172.6 (former section 1170.95) to the Penal Code, creating a procedural mechanism whereby "convicted murderers who could not be convicted under the law as amended" may petition to have their convictions vacated and be resentenced on any remaining counts. (*Lewis*, *supra*, 11 Cal.5th at p. 959.)  If a section 1172.6 petition sets forth a prima facie case for relief, the court must issue an order to show cause and hold an evidentiary hearing at which "the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after [Senate Bill No. 1437]." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952; see § 1172.6, subd. (d)(3).)  " 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 880.)

In 2021, Smith filed a petition for resentencing relief pursuant to section 1172.6.  The trial court appointed counsel to represent Smith in the resentencing proceedings.  Smith's counsel

5

filed two briefs arguing that Smith was entitled to resentencing because (1) he did not actually kill the victims, (2) he did not act with the intent to kill, and (3) although he was a major participant in the robbery that resulted in the murders, he did not act with reckless indifference to human life as defined in the Supreme Court's then-recent decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

The trial court found Smith had demonstrated a prima facie case for section 1172.6 relief and set the matter for an evidentiary hearing.

### 1. *Prosecution Case*

At the July 2024 evidentiary hearing, the prosecution relied exclusively on the transcript of Smith's 1997 trial[3] to meet its burden of proving beyond a reasonable doubt that Smith acted with reckless indifference to human life.[4] As relevant here, the transcript includes testimony from (1) Jonathan, (2) Detective Jesse Castillo, one of the Los Angeles Police Department (LAPD) homicide detectives assigned to the case, (3) Thricia, and (4) Emmette Jean Braggs, a forensic print specialist with the

---

[3] Smith requested that we take judicial notice of the opinion and record in *Smith I*, which included a copy of the trial transcript. That record, however, was destroyed. We therefore take judicial notice of the superior court's copy of the trial transcript on our own motion. (Evid. Code, § 452, subd. (d)(1).)

[4] Jonathan appeared at the evidentiary hearing, represented by independent counsel. Although the court granted his counsel's request to read Jonathan's victim impact statement during the hearing, the court expressly did not consider the statement in ruling on Smith's resentencing petition.

6

LAPD, who testified concerning fingerprints found at the crime scene.

### a.  *Jonathan's testimony*

Jonathan testified that, at the time of the incident, he lived with his parents and older brother, Jason, at their home in Chatsworth.  Jonathan knew Smith because Smith had attended school with Jason.  Jonathan thought that Smith was a good friend.  Smith had visited the Landau home, had met Richard and Donna, and may have spent the night at the Landaus' house on at least one occasion.

On the day of the crimes, Smith called Jonathan somewhere between noon and 1:00 p.m.  Smith "said he wanted to come down and visit for a little bit, see some of his old friends, see how everything was going."  Jonathan testified that Smith planned to visit at 6:00 p.m., but failed to arrive on time.  Jonathan waited until 9:30 p.m. before finally calling another friend to make plans "because [Smith] wasn't showing up."

While waiting in his front yard for his other friend, Jonathan "thought [he] saw [Smith] drive by in a car with one other person in the car."  "It looked like a convertible Dodge Chrysler," "sort of a brownish color."  "[A]fter a couple of minutes," Jonathan "saw the same car go by again.  [Smith] looked at [him]," but the car pulled into the parking lot of a nearby bar, and Jonathan "didn't see [the car] again."

Jonathan's friend then picked him up, and they went to another friend's house.  While there, Jonathan received a page from Donna saying that "[Smith] had just called from Hughes Market down the street from [the Landaus'] house, and [Smith] was down there."  Jonathan went to Hughes Market with two of his friends, but did not find Smith.  Jonathan then returned to his own house.

7

Almost immediately upon returning home, Jonathan heard the doorbell ring. He went out front and "saw [Smith] standing out there talking to [the friends who had accompanied Jonathan to Hughes Market]." Jonathan asked Smith "what took so long," and Smith said "he had to drop his heat off to some of his people[ ] because his girlfriend gets mad if he keeps it in the house." Jonathan testified that when Smith said "heat," he knew that Smith was referencing a gun. Jonathan further testified that he had seen Smith with "a small palm size .22" caliber gun on one prior occasion.

Jonathan and Smith then went inside the Landaus' home. They "were inside for a little bit," and Jonathan "asked [Smith] when his people were coming back. [Smith] said he didn't know." Jonathan briefly exited the house to tell his other friends that he and Smith "were just going to stay in." Shortly thereafter, Smith went back outside "to check and see if his people [had come] back by yet." Smith walked "[o]ut to the street," "looked up and down the street, said they weren't there, turned around and came back."

Jonathan and Smith went back inside the house. The front door locked behind them. Smith sat down on the couch. Jonathan "told [Smith] [he] was going to be right back. [Jonathan] had to go shut the [telephone] ringers off in [his] room and in [Jason's] room" "[i]n case [his] girlfriend called back" because he did not want to wake his sleeping parents.

As Jonathan walked down the hallway to return to Smith, "the front door open[ed]. Someone walk[ed] through [the] front door, . . . look[ed] in the living room, turn[ed] around to [Jonathan], [and] put[ ] [a] gun in [his] face. [The man] had a mask on[.] [He] told [Jonathan] to go in the living room [and lie] down on the floor." Jonathan noticed that Smith was no longer sitting on the couch, but instead "on the chair" "close to the front door."

8

The masked man told Smith "to [lie] down, too," and he complied. At some point, the masked man said to Smith: " 'You're some sort of punk, I can't believe the kind of people you hang around with.' " The man asked Jonathan how many other people were in the house and where they were located. Jonathan replied that his parents were asleep in their bedroom. The man went into Richard and Donna's bedroom, woke them, and "told them to get in the hallway." Jonathan testified that Richard "thought . . . someone was playing around or something, and the guy with the mask hit him in the head with the gun." They all went into the hallway. The masked man again told everyone to lie down, but "[Smith] was still standing." Smith did not lie down until the man had repeated the command several times.

The masked man proceeded to take the gold necklace off Richard's neck. He then told Smith to "get back up" and "tape [Richard, Donna, and Jonathan] up." Smith placed duct tape over Richard's eyes and taped Richard's hands behind his back. The masked man also told Donna to take off her tennis bracelet. "He told her to hurry up, and then she said it's not real. It's not worth that much. He said he didn't care; hurry up and take[ ] it off or he'll pop a cap in her ass." After Donna removed the bracelet, Smith "taped her up," wrapping duct tape across her eyes and around her head and hands. Finally, "they taped [Jonathan]. . . . [¶] . . . First [his] eyes and then [his] hands."

Once his eyes were taped, Jonathan could no longer see anything. But he "heard people asking where the money and jewelry [were], and [he] heard people going—someone going through things, like through the jewelry, like through the drawers in [his] parents' room, like ransacking." It was "always one voice" making the requests, but Jonathan could not tell whether it was Smith's voice or the masked man's voice.

9

Either Smith or the masked man then attempted to remove Jonathan's necklace from his body, and Jonathan fainted. Jonathan "came to . . . when [he] felt somebody grab [him] by [the] belt loop and drag [him] . . . [¶] . . . [¶] . . . [i]nto a different room." "It felt like the bathroom because [he] felt the toilet." "[He] hear[d] someone walking around . . . going through things. [He] start[ed] hearing a plastic bag; getting plastic bags." Next, Jonathan heard "[t]he crinkling of [a] bag like it opening . . . [¶] . . . [¶] . . . [and] the sound of tape as if someone was putting it on." He heard Donna say that "it was hard for her to breathe," and someone replied, "here, this will help you out." Jonathan "heard the bag pop like a little hole was popped in the bag, and [he] could heard [Donna] breathing for air . . . [¶] . . . [¶] . . . [h]eavily."

Jonathan then "heard [Richard] start[ ] yelling." "He was saying, . . . 'Don't do it man, don't do it; I won't be able to breathe; don't do it.'" "[H]e was struggling, and then [Jonathan] heard a pop. Then [Richard] started screaming, 'I've been shot; I've been shot. He shot me.'" "Then he was wheezing, stopped breathing, then [Jonathan] heard another shot, and . . . felt [Donna's] head hit [his] head. [Jonathan] heard [Donna] breathing; there was another pop, [Jonathan's] leg started hurting, and then—[¶] . . . [¶] . . . he [lay] there, stayed quiet." Jonathan testified there were two or three seconds between the first and second gunshots and one or two seconds between the second and third shots.

Jonathan "sat there for a while," "listening to see if [he] heard anybody else in [his] house." Eventually, he was able to slip one of his hands out of the duct tape and push some of the tape off his left eye. He "got up and . . . went out to the hallway, looked down towards where the living room was[,] and the kitchen lights were on, the front door was left open, the back door was left open." Then,

10

Jonathan "thought [he] heard somebody, so [he] went and [lay] back down . . . [¶] . . . [¶] . . . by the toilet."

He got up again a few minutes later and found Richard in the hallway with "blood all over his body." He did not see Donna's body because he still "couldn't see that well." Jonathan went to his room, climbed out the window, and "[lay] down on the roof on [his] stomach to see if [he] could see anything going on in the yard." A few minutes later, Jason—who had left the house earlier in the evening—arrived. Jonathan "waited until [Jason] pulled around to the back just to make sure it was him," and then "yelled out his name." "[Jonathan] told him that [Smith] was there and some other guy with a mask, that the house was robbed. [And that he] thought [Richard and Donna were] dead."

Jason drove Jonathan to a friend's house, where Jason called 911. At the friend's house, Jonathan examined his injured leg and saw that he had a bullet wound to his right thigh.

### b. *Detective Castillo's testimony*

Detective Castillo testified concerning his examination of the physical crime scene. He observed "[n]o pry marks" on the front door or any other doors in the house. The front door "was in a locked position as if somebody had opened it from the inside or somebody had a key."

Inside the house, Detective Castillo observed "some evidence of ransacking" and the bodies of Richard and Donna. Richard was "taped to his eyes, nose, he had tape on his right hand . . . and he was bloodied all through his upper chest and through his arms." Donna's "hands had been wrapped with gray duct tape, and her head was covered with plastic, and at her neckline [there was] gray duct tape."

11

Detective Castillo further testified that officers recovered one bullet from the residence, from underneath Donna's body. The parties stipulated that this bullet and the bullets later recovered from Richard's and Donna's bodies all were .22 caliber bullets fired from the same .22 caliber firearm.

### c. *Thricia's testimony*

Thricia testified that she and Smith dated for two and half years before marrying in October 1995. They share one child. Thricia and Smith separated a month and a half after getting married, and Smith moved in with a woman named Keesha. At the time of the incident, Thricia was interested in reconciling with Smith.

On the night of the robbery, Smith asked Thricia to pick him up so they could discuss their relationship. Thricia drove her mother's car—a brown, nonconvertible Dodge—to Keesha's house to pick up Smith. Smith was not allowed to use the car outside of Thricia's presence. Smith got in the driver's seat of the car. Thricia did not see him holding a gun, duct tape, or a ski mask. Smith drove himself and Thricia to another location in Compton to pick up Allison. Allison was "dressed in full black," and Thricia did not see anything in his hands. Allison sat in the back seat of the car. After picking up Allison, Smith drove to the Landaus' house in Chatsworth.

Thricia testified that, on the way to Chatsworth, Smith asked Allison, " 'Are we going to do this?' " Allison replied, " 'Yeah. It's all to the good.' " When Thricia asked what they were talking about, Smith said, " 'Don't worry about it.' " On cross-examination, Thricia testified that Smith and Allison were smoking marijuana and rapping in the car. Thricia further testified that Smith often

rapped, and that she had heard him ask, "Are we going to do this?" before rapping in the past.

At some point during the drive, Smith braked, and a gun slid beneath Thricia's feet in the front passenger seat. At first, Thricia testified that she did not ask any questions about the gun. Later, however, she testified that she recalled asking Allison whether the gun was his, and Allison replied, "[Y]es, [and] that he needed it for protection."

When they arrived at the Landaus' house, Smith left the car for approximately 10 to 15 minutes. When he returned, he "said that Johnny or Jason wasn't there." Thricia, Smith, and Allison then drove to a Taco Bell "just a few blocks away." They ate, and at some point, Smith and Allison got out of the car and spoke to one another "for about a minute or two." Smith then went to a phone near the Taco Bell and made two calls. When he returned, he said that "the boys would be there in a minute."

Thricia, Smith, and Allison drove back to the Landaus' residence and parked the car "two or three cars" back from the driveway of the house. Thricia saw a red car pull up and "[t]wo boys and a girl" exit the car. Smith went and talked to the boys. "They were hugging and shaking hands," and "[Smith] went into the house with one of the guys." Thricia and Allison waited in the car. Thricia testified that, while they were alone, Allison told her "that he had a gun and that he had killed somebody before."

After about 15 minutes, the other boy and the girl who had arrived in the red car left. Allison then exited the brown Dodge, carrying "gray tape and a gun." Allison walked in the direction of the Landaus' house and disappeared behind trees that shielded the house from view. Thricia waited in the car "[f]or about 15 or 20 minutes." Then she heard three gunshots. Thricia saw Allison come "running out" with "something in his hands," although she could not see what it was. Allison got into the car and said Smith

13

would "be right here." Moments later, Smith entered the car, and one or both of Smith and Allison told Thricia to drive. Smith appeared to be angry.

After Thricia drove a short distance, Smith "told [her] to switch places," and Smith drove the car back to Compton. Thricia observed a necklace and a checkbook bearing the name "Donna" in the car. During the drive, Smith "asked [Allison] why he hit him with a gun so hard." Allison responded that "[h]e had to do it." Allison also said "that he had to use the credit cards within 24 hours." Thricia further testified that Allison told her, in Smith's presence, that "if anyone [said] anything . . . about what happened, [Allison] was going to have [Smith] and his family killed." On cross-examination, however, Thricia testified that she neglected to tell the lead homicide detective about Allison's purported threat.

In addition—although Thricia initially testified that she did not recall whether Smith made further statements—Thricia confirmed that she told police during a recorded interview that Smith remarked on the drive back to Compton, " 'I got a chain,' " and said to Allison, " 'Did you see the look on Johnny's face?' "

After dropping Allison off, Smith and Thricia drove to Keesha's house. Thricia picked her daughter up from Keesha, and left. Smith stayed at Keesha's house.

Finally, on cross-examination, Thricia admitted that she had not initially been truthful with police about the incident. She further testified that she had been granted immunity in the case prior to testifying, but understood her immunity could be revoked if she committed perjury.

### d. *Bragg's testimony concerning fingerprint evidence*

Braggs testified that fingerprints lifted from (1) a Delta card retrieved from the crime scene, and (2) the duct tape removed from

Donna's neck, with the plastic bag attached, matched Smith's fingerprints.

## 2. *Defense Case*

In response, the defense offered testimony from one new witness at the evidentiary hearing: Dr. Katy Drorit Gaines, an expert in clinical psychology and neuropsychology, who performed in-person neuropsychological assessments of Smith in 2023 and 2024. Dr. Gaines also interviewed some of Smith's family members.

Dr. Gaines provided background testimony concerning the science of brain development and executive functioning. She testified that the brain is not fully developed until the mid to late 20s and that "the last area to develop in the brain to full maturation is the frontal lobe and prefrontal cortex," an area responsible for executive functioning.

Dr. Gaines further testified that, based on Smith's own reporting and other sources, Smith scored a 10 out of a possible 10 on the Adverse Childhood Experiences test. These experiences included persistent poverty, parental neglect and absence, and exposure to neighborhood violence. In addition, Smith reported that, when he was 12, a family friend raped him. Dr. Gaines opined that this sort of "[t]rauma . . . impact[s] the brain and the frontal lobe." And she opined that "the data [she] reviewed and collected" concerning Smith's life prior to the crimes "supports that . . . age-related and family social circumstances really did impact, could have contributed to Mr. Smith's decisions around—or [at] the time of [the] offense." She therefore concluded "[i]t's possible" that "the facts of the crime and the facts that [she] ascertained . . . support an inference that . . . Smith might not have subjectively appreciated the risk of the conduct that he was engaging in."

15

Dr. Gaines, however, conceded that she faced certain limitations in conducting her evaluation: "It's important to note that I am testing the individual almost 30 years after the event, the incident. And so[,] at best[,] we are able to administer tests that are looking into [a person's] current functioning, [and] some tests that [give] us some insight possibly [into] what the person may have suffered from or experienced closer to the time of the crime." And on cross-examination, Dr. Gaines agreed "[i]t is a possibility" that "Smith did foresee the consequences [of his actions], but he committed the crimes anyway because he didn't care about the consequences." She further testified that the act of using duct tape to affix a plastic bag to someone's head "could possibly indicate psychologically that the person that's doing that could be enraged, interested in terrorizing or scaring or controlling the person." Finally, Dr. Gaines testified that, to the extent Smith made the comment, "Did you see the look on Johnny's face," that "certainly . . . [would be] pointing at a markedly reduced empathy."

### 3. *Trial Court's Findings*

At the conclusion of the hearing, the court found that the trial evidence—including evidence that Smith orchestrated the crimes, taped the plastic bag around Donna's head, and witnessed Allison threaten and assault the Landaus with the gun before firing any shots—established beyond a reasonable doubt that Smith acted with reckless indifference to human life. The court further found that Dr. Gaines's testimony did not negate this evidence. It explained that, while it found Dr. Gaines to be "very hard working, dedicated, and prepared" and would "giv[e] her testimony some weight," her analysis had limited probative value because she was attempting to analyze Smith's ability to assess risk at age 19 based on tests administered to Smith during his mid-40s. The court

16

therefore denied Smith's request for resentencing pursuant to section 1172.6.

Smith timely appealed.

## DISCUSSION

### A.   Standard of Review

We review the trial court's factual findings at a section 1172.6 evidentiary hearing for substantial evidence.  (*Emanuel*, *supra*, 17 Cal.5th at p. 885.)  "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt" that the petitioner is guilty of murder under a still-valid theory.  (*Ibid.*)

" 'Our job on review is different from the trial judge's job in deciding the petition.  [Although] the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' [Citation.]"  (*People v. Davis* (2024) 107 Cal.App.5th 500, 509 (*Davis*).)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [fact finder]'s verdict.' [Citation.]"  (*Id.* at p. 510.)  " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' [Citation.]"  (*Ibid.*)

17

## B. Substantial Evidence Supports that Smith Acted with Reckless Indifference to Human Life

Smith contends no substantial evidence supports that he acted with reckless indifference to human life, as required to support his convictions under a felony-murder theory.[5] We disagree.

"[R]eckless indifference to human life 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation.]" (*Emanuel, supra*, 17 Cal.5th at p. 883.) " 'Examples include "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property." ' [Citation.]" (*Ibid.*)

Further, "reckless indifference encompasses both subjective and objective elements. [Citations.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' [Citations.] 'As to the objective elements, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " ' [Citations.]" (*Emanuel, supra*, 17 Cal.5th at p. 884.)

---

[5] Smith concedes he was a major participant in the underlying robbery.

18

"We analyze the totality of the circumstances to determine whether [Smith] acted with reckless indifference to human life." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  Relevant considerations include (1) "use of or awareness of the presence of a weapon or weapons," (2) "physical presence at the scene and opportunity to restrain confederates or aid victims," (3) "the duration of the crime," (4) "knowledge of any threat the confederates might represent," and (5) "efforts taken to minimize risks." (*People v. Strong* (2022) 13 Cal.5th 698, 706, citing *Clark*, supra, 63 Cal.4th at pp. 618–623.)  But " ' "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Scoggins*, *supra*, at p. 677.)  "Courts of Appeal [also] have recognized that 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.' [Citations.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 885, fn. 6.)

### 1. *Awareness of Weapons and Confederate's Potential for Violence*

Substantial evidence supports that Smith knew a gun would be used during the incident.  Thricia's testimony provides direct evidence of such knowledge:  She testified that, while driving to the Landaus' residence, she saw the gun in the car and asked Allison about it in Smith's presence.  Further, Jonathan's testimony supports an inference that Smith supplied the gun:  Jonathan testified that he previously had seen Smith in possession of a .22 caliber gun—the same caliber used in the crimes.

Smith argues, correctly, that mere knowledge that a co-perpetrator is armed is insufficient to establish reckless indifference to human life.  (See *Banks*, *supra*, 61 Cal.4th at p. 809, fn. 8 [disapproving an earlier decision "to the extent it holds the knowledge one's accomplice is armed can, by itself,

19

establish reckless indifference to human life"].) But here, there is more. Circumstantial evidence—including Smith's preexisting relationship with the Landaus, Smith's conversations with Allison before and after the robbery, and the absence of any signs of forced entry into the Landaus' home—supports that Smith orchestrated the crimes. This gives rise to an inference that Smith knew that Allison intended to use the gun to carry out the robbery. (See *Davis*, *supra*, 107 Cal.App.5th at p. 510 [substantial evidence includes reasonable inferences drawn from circumstantial evidence].)

Further, Thricia's testimony supports that Smith did not express any surprise that the Landaus had been shot. (*Scoggins*, *supra*, 9 Cal.5th at p. 679 ["[a] defendant's actions after the shooting may also bear on the defendant's mental state"].) Rather, in the immediate aftermath of the incident, Smith made what he characterizes as "bravado statements" concerning a necklace he had stolen and "the look on Johnny's face" during the incident.

Although these facts are themselves substantial evidence of Smith's awareness of Allison's potential for violence, we further observe that Thricia testified that Smith and Allison were cousins, and that Allison shared with her that he had killed someone in the past. Although Smith was not present when Allison made this statement to Thricia, Allison's willingness to share this information and Smith's familial relationship with Allison further support Smith's awareness of Allison's potential for violence.

We therefore conclude that these factors support the court's finding of reckless indifference.

### 2. *Presence at Scene, Opportunity to Restrain, and Duration of Crime*

Smith concedes that he was present at the scene, and that he personally applied duct tape to the victims. These concessions are

significant: " '[P]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' [Citation.]" (See *Scoggins*, *supra*, 9 Cal.5th at p. 678.)

Smith contends his culpability nonetheless is diminished because (1) the duration of the incident was relatively short (*see In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 [describing minutes-long encounter as "negligible"]), (2) he had no opportunity to restrain Allison from shooting the Landaus, as the shots occurred only seconds apart, and (3) Allison "asserted dominance over [Smith]" by issuing orders during the robbery and by threatening Thricia as they fled the scene. Smith argues these factors demonstrate that he "lacked the power or agency to intervene or aid the victims without risking his own life."

Smith, however, ignores that Allison demonstrated a willingness to use potentially lethal force at the very outset of the robbery when he struck Richard in the head with the gun. And Smith made no effort at that point to restrain Allison or to otherwise deescalate the level of violence. To the contrary, the fingerprint evidence supports an inference that Smith himself increased the level of violence during the robbery by taping the plastic bag on Donna's head. Smith likewise ignores that Allison's dominant demeanor during the robbery is consistent with an

21

inference that, as part of a preconceived plan, Smith was posing as a victim of the robbery to avoid being identified by any survivors of the incident. And the trial court was free not to credit Thricia's statement concerning Allison's purported threat, which Thricia admitted she had failed to disclose to the lead homicide detective.

We therefore conclude that, with the exception of the duration of the incident, these factors support that Smith acted with reckless indifference.

### 3. *Opportunity to Render Aid*

The record supports that Smith took, at most, only one step to aid one of the three victims: It is possible it was Smith who popped the hole in the plastic bag taped around Donna's head. Critically, however, the record also supports that Smith had an opportunity to aid the Landaus after the shootings but elected not to do so. This failure strongly supports that Smith exhibited reckless indifference to human life. (See, e.g., *People v. Mitchell* (2022) 81 Cal.App.5th 575, 580 [defendant exhibited reckless indifference to human life by, inter alia, failing to "render or summon aid for the victim," who had sustained five gunshots].)

Smith insists that "no evidence suggests that [he] was aware, at [the] time [of the incident], that Allison had shot or killed anyone." But Thricia's testimony gives rise to an inference that Smith was in the house when the shots were fired. And Jonathan testified that, immediately after being shot, Richard exclaimed, " 'I've been shot; I've been shot. He shot me.' " This evidence supports that Smith was aware the Landaus had been shot before he fled the scene. This factor therefore weighs in favor of the reckless indifference finding.

### 4. *Efforts to Minimize Risk*

Apart from the possibility that Smith popped a hole in the plastic bag around Donna's head, there is no evidence that Smith made any effort to minimize the risk of violence during the incident. Rather, substantial evidence supports that Smith planned the robbery and thus knew the plan included bringing a gun and duct tape to the Landaus' home. This gives rise to an inference that Smith anticipated the possibility that the Landaus would resist the robbery and that violence and the use of weapons would be necessary to restrain them.

We therefore conclude this factor supports the court's finding of reckless indifference.

### 5. *Smith's Youth at the Time of the Offenses*

Finally, we agree that Smith's age at the time of the offense, along with his adverse childhood experiences, tend to weigh against a finding of reckless indifference. But Dr. Gaines herself conceded the limitations of the analysis she performed concerning this factor. And she opined only that "it's possible" that Smith might have failed to appreciate the potentially lethal risks of his conduct. We therefore are not persuaded that this single factor outweighs the other, substantial evidence supporting the court's finding that Smith acted with reckless indifference to human life.

Accordingly, we affirm the order denying Smith's section 1172.6 petition.

### C. The Trial Court Must Correct Clerical Errors in the Amended Abstract of Judgment

The parties agree, as do we, that the amended abstract of judgment contains a clerical error. *In Smith I*, we directed the trial court to modify the abstract of judgment to reflect the imposition of section 12022, subdivision (a) enhancements on counts 1 through 7.

23

The amended abstract of judgment, however, erroneously provides that the court imposed enhancements under section 12022.5. We therefore order the court on remand to issue a further amended abstract of judgment that removes the references to section 12022.5 and reflects the imposition of section 12022, subdivision (a) enhancements on counts 1 through 7. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [the appellate court may direct the trial court to correct clerical errors in an abstract of judgment].)

## DISPOSITION

The order denying Smith's section 1172.6 petition is affirmed. On remand, the trial court is directed to prepare an amended abstract of judgment that removes any references to section 12022.5 and reflects the imposition of sentence enhancements on counts 1 through 7 under section 12022, subdivision (a). The court shall forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

WEINGART, J.

M. KIM, J.

24